## ROY COLGLAZIER v. STATE.

No. A-3924.     Opinion Filed Feb. 3, 1923.

(212 Pac. 332.)

(Syllabus.)

1. **Rape—Evidence Sustaining Conviction of Assault with Intent to Rape Child.** Evidence examined and held sufficient to support a conviction of assault with intent to rape a female child under the age of consent.

2. **Evidence—Conduct of Accused when Informed of Accusation, His Subsequent Flight, and Explanation Thereof Admissible.** Evidence of defendant's conduct and actions, when first informed that he is accused of an offense, and of his subsequent flight, is admissible against him, and the circumstances surrounding such conduct are res gestae thereof. Defendant's explanation of such conduct is likewise admissible.

3. **Trial—Requested Instruction Properly Refused If Covered by General Charge.** It is not error to refuse a requested instruction, correctly stating the law applicable to the issues, if such law is sufficiently covered in the general charge.

Appeal from District Court, Payne County; Arthur R. Swank, Judge.

Roy Colglazier was convicted of assault with intent to rape, and he appeals. Affirmed.

John F. Vaughan, for plaintiff in error.

George F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

MATSON, P. J. Plaintiff in error, Roy Colglazier (hereinafter referred to as defendant), was convicted in the district

court of Payne county on the 22d day of October, 1920, of the crime of assault with intent to commit rape and sentenced to serve a term of five years' imprisonment in the state penitentiary.

The information, in substance, charges that on the 18th day of May, 1920, one Roy Colglazier, did then and there willfully, unlawfully, and feloniously commit an assault upon the person of one Maxine Moore, with his hands, seize, hold, strike, wound, and illtreat her, the said Maxine Moore, with the willful, unlawful, and felonious intent of him, the said Roy Colglazier, then and there to carnally know, ravish, and have sexual intercourse with her, the said Maxine Moore, she, the said Maxine Moore, being then and there a female child under the age of 16 years and of the age of 11 years, and not the wife of him, the said Roy Colglazier.

The alleged offense occurred in the city of Stillwater, the county seat of Payne county, some time between 5 and 6 o'clock on the afternoon of the 18th of May, 1920. The prosecuting witness detailed the circumstances of the crime as follows:

"Q. Then what, if anything, did Roy Colglazier do? A. He went up stairs. Q. Then what, if anything, did he do? A. He told me to come up there. Q. Did you go up there? A. Yes, sir. Q. When you got up there what was Roy Colglazier doing, if anything? A. He was in his bedroom. Q. Go ahead and tell the jury? A. He was in his bedroom and had his trousers off, and I stepped in the door, and said, 'Oh.' He stepped back. Q. Then what, if anything, did Roy Colglazier do? A. He stepped to the other side of the room. Q. Will you explain to the jury—where were you then? A. At the head of the steps. Q. Did Roy Colglazier come to you then? A. He stepped to the other side of the room. Q. Then what, if anything, did he do? A. He says, 'Wait a minute until I get my pants on.' Q. Then what did he do? A. He said, 'Come in the bedroom and look in the bottom drawer.' Q. Did you go in?

A. Yes, sir. Q. Then what happened next? A. He says, 'We will go and look in some of Elma's playthings.' Q. Did he have his pants on? A. Yes, sir. Q. Then what, if anything, did he do? A. He stepped back and let me in Elma's room, and we looked in some boxes, and the book wasn't there. Q. Then what happened? A. He shut the door. Q. Why did he shut the door? A. I don't know. Q. Where were you and he then? A. I was in this room and so was he. Q. Then what, if anything, did he do? A. He sat down on a stool. Q. Then what, if anything, did he do? A. He took hold of my shoulders, and drew me up to him. Q. What, if anything, did he do then? A. He asked me if I would take off my panties, and he would take off his. Q. What, if anything, else? A. And if I would let him see me, he would let me see him. Q. What, if anything, else? A. And he put his hand on me. Q. Show the jury where he put his hand on you? A. Just like that (indicating to the jury). Q. Then what, if anything, did he do? A. I said, 'I want to go down and play with Lucile and Gladys,' and I says, 'I will scream for Lucile and Gladys, if you don't let me go.' Q. Then what did he do? A. Got up and stepped to the door and says, 'You promise you won't tell anybody I had my pants off.' He said that twice. Q. What did you tell him? A. I says, 'I won't.' Q. You say he took hold of you and pulled you up to him. A. Yes, sir. Q. Tell the jury what he did then, just how he pulled you up? A. He took hold of my arms like this (indicating) and brought me up between his legs. Q. What did you do when he pulled you between his legs? A. I told him I wanted to go play with Lucile and Gladys, and I would scream for Lucile if he didn't let me loose. Q. What did he do then? A. He asked me if I would take down my panties, and he would take off his. Q. Then what did he do? A. If I would let him see me, he would let me see him. Q. Then what did you do? A. I told him to let me loose; I wanted to go play with Lucile. Q. Then what did he do? A. He said twice, 'Don't tell any one I had my pants off.' Q. Then what did he do? A. He opened the door, and I went down stairs and out doors. Q. Who did you find out doors? A. Lucile Hethering-ton. Q. Anybody else? A. No, sir. Q. Who did you first tell about this afterwards? A. I told Lucile and Gladys. Q. How

soon did you tell them after this happened? A. I went over to where we were playing. Q. Then who did you tell next, if you told any one? A. I told my mother. Q. How long after this happened until you told your mother? A. About 15 minutes afterwards. Q. Where was your mother when you told her? A. In the house. Q. What, if anything, were you doing when you saw Gladys and Lucile? A. I told them, then I went home. Q. What, if anything, were you doing when you went down stairs from Roy Colglazier? A. I went out doors and met Lucile Hetherington at the corner of the house, and she asked me what I was crying about. Q. Were you crying at the time? A. Yes, sir."

The defendant, as a witness in his own behalf, explained what occurred on that occasion as follows:

"Q. State your name? A. Roy Colglazier. Q. Tell the jury what happened in this matter? A. I was there at home about 12 o'clock, and this little girl come along and asked for a book. I told her what was the name of the book, and she said she didn't know. I says, 'I don't know nothing about the books; my folks are not at home,' and I says, 'You find out the name of it and come back and let me know.' Then I says, 'I will see if I can find it.' I went back to work, and about 5:30 she came back and I was feeding the chickens. Pretty soon Dorothy Moyne Shideler was there, and I says, 'Where is Maxine?' and she says 'over to Gladys' playing.' She called Maxine and Maxine came over and asked me what I wanted. I asked her for the name of the book, and she told me, and I told her to go look for it. She went in the front room to hunt for the book. I went up stairs to change my clothes, and I was sitting on the bed with my trousers off and taking off my shoes. She run up stairs and says, 'Oh.' Q. Did you call her up there? A. No, sir. I went and stepped to the other side of the room and pulled the door kinda to and she couldn't see in my room. I says, 'You go look in my sister's room.' I says, 'It ain't in my room.' She went on in there, and when I got my clothes on and started down stairs, there she stood crying, and didn't say nothing. I says, 'Do want to go?' and she didn't say nothing. I says, 'Don't go out crying and tell

anybody you seen me with my pants off, and she says, 'All right.' Q. Did you go in the other room with her? A. No, sir. Q. You heard her testify that you asked her to let you see her? A. Yes, sir. Q. Is that true? A. No, sir. Q. You heard her testify that you pulled her up between your legs? A. Yes, sir. Q. Is that true? A. No, sir. Q. Did you ever assault her in that way? A. No, sir. Q. Did you have any intention of having intercourse with her? A. No, sir.''

Gertrude A. Moore, the mother of the prosecutrix, testified that her daughter Maxine was 11 years of age, and that about 5:30 o'clock on the afternoon of the 18th of May, 1920, her daughter came home crying and said she wanted to tell her something, and then told her what had happened.

Lucile Hetherington, witness for the state, testified that she was 12 years old, that she saw defendant on the 18th of May, 1920, in the yard at his house about 5 o'clock in the afternoon, and that she heard defendant tell Dorothy Moyne Shideler to tell Maxine Moore to come over there, and that Dorothy told Maxine, and that Maxine went over to defendant's house.

Ralph Woods, a witness for the state, testified, in substance:

That he knew defendant and was with him on the 18th of May, 1920; that he first saw him down at the City Meat Market about noon and went with defendant to take two orders of meat to the north part of town, and after dinner went back to the butcher shop, and then the witness testified, over objection by defendant's counsel, that the colored butcher told Roy that there was a fine looking man come in there with a blue serge suit on, and a boy came in with a soldier suit on, and that Roy went out of the back door and then came back in the butcher shop and was hollering something and got a knife and said, ''stand back.'' Mr. Moore said ''Why don't

you come in there" and he said, "I got a knife," and they stood back there a little while and then went in the shop. Mr. King was there and made Roy come in the shop and wanted them to stop. Then went up to the front end of the shop and Mr. Moore told him to come to his office and he would settle it. Then we had to get some meat up to the north end of town, then we went to the Service Garage and Roy asked for Mr. Fletcher, and he wasn't there. Then we came back up town and found out where the orders went. I took that order up there, and Roy got in the car with me, and I went to drive his car, and Mrs. Baron and Mrs. Moore got in their car and followed us, and I was trying to outrun them. I asked Roy what was the matter, and he didn't say much, and I asked him again, and he said she came up to his room where he was undressing, and he got hold of her arm and made her promise, and he kept driving fast.

On cross-examination the witness testified that the men that came in the butcher shop were H. G. King and Alphonzo Taylor, and that the men looking for defendant were Dr. Moore (father of prosecutrix) and Mearle Barron; that they were chasing defendant and said for defendant to come back and they would give him a good licking. Witness would not say for sure they had said they were going to kill defendant.

Sam Dykes, a witness for the state, testified that he lived in Stillwater, knew the defendant and recollected of hearing about the trouble between the defendant and Maxine Moore, and then witness testified as follows:

"Q. What did Roy say to you about it? A. He was trying to get out in the country. He was afraid of Mr. Moore. I asked him what he was running for, and he said that girl come up to his room while he was dressing. Then we stood out there about an hour or more, and I kept on questioning. And he said he 'grab and throw.' I don't know what he meant.

"By Mr. Vaughan: Move that it be stricken out as incompetent, irrelevant and immaterial, don't have any meaning.

"By the Court: Overruled, exception allowed.

"By Mr. Suman: Q. What were you talking about when he says 'grab and throw'? A. I was questioning him about it. Q. What were you questioning him about? A. Why he was getting out in the country for. Q. Who were you talking about then? A. I didn't know right then. Q. Did you know why he was getting out in the country? A. Not until we got out there. Q. What did he tell you? A. He said that Maxine Moore came up to his room while he was dressing. That is all he said. Q. Did he tell you why he was getting out in the country? A. No, sir. Q. How did you come to go out? A. We were up to the butcher shop, and I never went in the butcher shop with them. I was outside sitting in the car. And I seen somebody in there doing something to Colglazier, and I went in there, and Mr. Moore and them were arguing in there. I went over to the Central Garage, and went to take an order, and took Colglazier up to his house. Then we drove on out in the country by the bridge and stayed out there about half an hour, and then Mart Fletcher come along and took us out about five miles further. Then he told me that story. That she come up to his room while he was dressing."

E. L. Moore, witness for the state, testified that he lived in Stillwater; that he was father of prosecutrix, and that she was 11 years old; that he first heard about the trouble about 6 o'clock in the evening, learned it through his wife; that Dorothy Moyne Shideler was at that time under quarantine for diphtheria.

Martin Fletcher, witness on behalf of the defendant, testified that he knew Roy Colglazier; that Roy worked for him, quit work about 5 o'clock on the 18th of May, 1920. Then the witness testified as follows:

"Q. On the day that this crime was alleged to have been committed you seen him at other places? A. What time do you mean? Q. On the day this thing was charged to have been

committed? A. Yes, sir. Q. Tell the jury? A. I saw him after I went home, and back down town, about 6 o'clock. Q. Where did you see him next? A. Down on the street. Q. What was he doing? A. He and Thomas Yoder were talking. Q. Did you see him after that? A. No, sir; not until the next morning. Q. Where? A. He come back to work the next morning for me. Q. Did you see him any place else on that day? A. He come back and worked about an hour that morning, and Mr. King in the city market wanted him to work for him. Q. Did you see him after that? A. I never saw him until about 1 or 2 o'clock. Q. Where was he then? A. He was out right north of town. Q. Do you know why he was there, or how he happened to be there? A. He said the Woods boy had taken him out there in a car. Q. You went out there with him? A. No, sir. Q. Where did you go after that? A. About 1:30 or 2 o'clock the Woods boy came by. Q. Then what did you do? A. I talked about 30 minutes, and decided I better go see what was the matter, and the Woods boy told me he was in a peck of trouble. Q. Then what did you do? A. I went down the street with the laundry car; then I went to the garage and got my car and went out there. Q. Who did you see? A. Roy Colglazier and this Dykes boy. Q. What, if anything, was he doing? A. Standing at the side of the track. I asked him what was the matter. Q. Did he tell you what the trouble was? A. He didn't tell me exactly. Q. What did you do? A. I told him to get in the car and go on up the road. Q. Then what happened? A. He got in, and we drove on up the road. Q. Just tell what you and he did? A. We went up the street north on the section line for about three or four miles, and then we turned west. Q. Did you tell Roy yourself what to do? A. I told him what I would do. Q. Did he do what you told him to do? A. Yes, sir. Q. What did he do? A. He stayed out there until I came back after him. Q. Then where did he go? A. He came back to town. Q. Who was with you? A. The Dykes boy and Joe Bourdette. Q. And he came back with you? A. Yes, sir. Q. And he did that upon your advice? A. Yes, sir."

Cross-examination by Mr. Suman:

"Q. Did you go out there purposely to bring Roy back into town? A. At which time? Q. The time you first went out? A. No, sir; I went out to see what he wanted. Q. He had sent in for you? A. Yes, sir. Q. And when you got out there, Joe Bourdette was out there? A. No, sir; the first time I went out, he sent for me to come out. I din't know what he wanted or anything. Q. Then you went out again? A. Yes, sir. Q. And Joe Bourdette was out there? A. No; he went out there with me in the car. Q. Did he go out as an officer in that case? A. Yes, sir. Q. Did he arrest him when he went out? A. No, sir. Q. Did. he have a warrant when he went out? A. I couldn't say. Q. At the time you went out, you say you found him out there with whom? A. The Dykes boy. Q. Do you know why Roy went out there in the first place? A. I did after he told me. Q. Why did he say he went out there? A. He said they accused him of attempt to rape, or were trying to, or something like that."

Redirect examination by Mr. Vaughan:

"Q. Did he tell you also, how he found it out, what they accused him of? A. I don't remember, but he mentioned something, them coming after him over at the meat market. Q. Did he tell you they told him up there—

"By Mr. Suman: Objected to as leading and suggestive.

"By the Court: Sustained, exception allowed.

"A. The Woods boy came by and told me to come out to the bridge, and I went out there.

"By the Court: Q. You saw the defendant? A. Yes, sir. Q. And had a conversation with him? A. Yes, sir. Q. Tell the jury what was said? A. I asked what was the trouble. He told me they accused him of attempted rape, or something to that effect. We drove along for half a mile without saying a word. I says, 'I don't know what to do about it, whether you are guilty or not.' I says, 'What do you want to do?' He says, 'I want to go to my folks.' They were at Durant. He says, 'I want to get to them, to see what to do.' We drove on for a mile and a half or two miles, and we turned back west, and I crossed the creek, and I says you get out here

and stay here until I come back after you at 4 or 5 o'clcck, and I will go into town and see what there is to. it. And several asked me where he was. Q. You went back there? A. Yes, sir. Q. Did you have any further conversation with him? A. Yes, sir. Q. Who was with you, if any one? A. The Dykes boy was standing there with him by the bridge on the bank of the creek, and Joe Bourdette was about a block from us in a car. Q. Did you have any further conversation with the defendant? A. Yes, sir; I told him what they wanted him for and asked him if he was guilty. I says, 'You know whether you are guilty or not guilty, and, if you are guilty, go back and take your medicine.' And he says, 'I would rather go to my folks.' I says, 'That is up to you.' I says, 'If you run off and they catch you, it will make it harder for you.' I says, 'Joe Bourdette is in the car.' He stood there a few minutes, and says, 'Well, I will go back.' He says, 'Mr. Bourdette, I am going back.' I don't know anything else was said before we got back to town or not. I brought him to the sheriff's office, and left him there. That is all I know about it.''

Error is assigned as follows:

(1) That the evidence is insufficient to warrant a conviction.

(2) The trial court erred in admitting irrelevant testimony over objection of plaintiff in error.

(3) The trial court erred in refusing to give instruction No. 2, requested by plaintiff in error.

(4) Because the punishment is excessive.

Under the first assignment of error, it is contended that the evidence is insufficient, because it tends only to show that the defendant, if he did anything, was merely taking indecent liberties with the prosecuting witness; that it falls short of an attempt to rape her because there is no evidence that the defendant placed his hands under prosecutrix's clothes or exposed his person to prosecutrix, and that when prosecutrix asked to be let loose she was let loose.

If the elements of force or nonconsent were material in a prosecution for assault upon a female child under the statutory age of consent, there would be some merit perhaps in the counsel's contention, but at most it can only be said that the evidence tends to show that defendant did not intend to commit a rape upon the prosecuting witness by force and against her will. On the other hand, we think the evidence is amply sufficient to authorize the jury to conclude that it was, however, the intention of the defendant by the acts done by him, as detailed by the prosecutrix, to rape the prosecutrix without force and with her consent. Overt acts indicating such an intention are in evidence here. Whether the defendant had such intention was a question of fact for the jury.

This court in the case of Lee v. State, 7 Okla. Cr. 141, 122 Pac. 1111, held:

"In a prosecution for an assault upon a female child under the statutory age of consent, with intent to commit a rape, it is not necessary to allege or prove that the acts were done against her will. Whether she consented, submitted, or resisted is wholly immaterial."

The conclusion is reached, therefore, that the first assignment of error is without merit.

The second assignment of error relative to the admission of irrelevant testimony has reference to that part of the testimony of the witness Ralph Woods concerning what the said witness told the defendant had occurred in the butcher shop on the next day after this alleged assault, in which the witness detailed the conduct of the defendant upon being told that certain parties had been to the butcher shop looking for him.

It is contended that this was hearsay testimony, and its admission prejudicial to the defendant. We consider this

evidence to have been admissible. The conversation was had directly with the defendant, and evidence of the defendant's actions and conduct, upon being informed that he was accused of such an offense, and his subsequent flight, was certainly admissible. Flight immediately following commission of an offense is a circumstance often indicating guilt. The defendant attempted to explain his flight in this case on the theory that the father of the prosecutrix and his friends were attempting to mob him. The explanation of the defendant, in fact everything he said concerning his flight, was permitted to go to the jury. The jury then was in possession of all the circumstances and was in a position to draw the proper inferences therefrom. We find no error prejudicial to the defendant in the admission of any evidence in this case.

The third assignment of error concerning the refusal of the trial court to give requested instruction No. 2 is not meritorious, for the reason that the trial court gave defendant's requested instruction No. 1, covering the same subject-matter and the law applicable thereto, and for the further reason that the trial judge in the general charge to the jury fully covered the law of the case, in a manner as favorable to the defendant as the evidence warranted.

While the defendant was given the maximum punishment under the law, we find no good reason for modifying the judgment on the ground of excessive punishment.

For reasons stated, the judgment of conviction is affirmed.

DOYLE and BESSEY, JJ., concur.